Rev. C. Herbert OLIVER et al.,
Plaintiffs,

v.

Bernard E. DONOVAN, Superintendent of Schools for the City of New York, et al., Defendants.

No. 68–C–1034.

United States District Court
E. D. New York.

Nov. 26, 1968.

Jeremiah S. Gutman, New York City, Rita Murphy and Morton Stavis, Newark, N. J., for plaintiffs.

J. Lee Rankin, Corp. Counsel, City of New York, New York City, for all defendants except Albert Shanker; John J. Loflin, Jr., New York City, of counsel.

Delson & Gordon, New York City, for Albert Shanker, as individual and official; Ralph P. Katz, New York City, of counsel.

TRAVIA, District Judge.

The plaintiffs bring on this matter by way of order to show cause seeking a temporary restraining order enjoining the defendants from continuing to:

1. take any action to compel the plaintiffs to retain within the School District of Ocean Hill-Brownsville teachers whom the Local Governing Board of the District has determined should be transferred out of the District;

2. station police in and around the Ocean Hill-Brownsville schools to enforce the terms of an agreement made by defendants pursuant to the settlement of a strike declared illegal by the New York Supreme Court; and

3. enforce the suspension and/or removal of principals of the Ocean Hill-Brownsville schools and the unit administrator Rhody McCoy, who have been selected by the community and/or community representatives.

Attached to the motion papers is the affidavit of one of the plaintiffs, Reverend C. Herbert Oliver, and the verified complaint. It is on these papers that the order to show cause was obtained and signed by this Court on October 11th, 1968.

The request for a restraining order as to item number "1" in the order to show cause was withdrawn. Consequently, all issues relating to these teachers have been removed from the case.

The plaintiffs moved to amend their application before the Court to include a request for a temporary restraining order enjoining the defendants, or any of them, from closing J.H.S. 271.

This motion is granted and ordered included in the order to show cause as item number "4".

We shall, therefore, deal with items "2", "3" and "4" in the order to show cause, the complaint and all the papers, exhibits and proceedings had.

In their complaint, the plaintiffs invoke the jurisdiction of this Court under Title 28 U.S.C. §§ 1331, 1343(3) and (4). In addition, they assert the action is authorized by Title 42, U.S.C. §§ 1981, 1983, 1985, 1986 and 1988. They claim the action arises under the 13th and 14th Amendments to the Constitution of the United States. (Par. 12, p. 5, complaint.)

At the outset and after a careful reading of all the papers submitted and the initial argument, there appeared to be a

serious question as to this Court's jurisdiction.

A hearing was afforded to the plaintiffs to give them an opportunity to show by testimony and exhibits a basis upon which jurisdiction of this Court could be established.

A study of the complaint shows that paragraphs "1" through "19" are preliminary or conclusory in nature, used to describe the charges, the alleged jurisdiction of the Court and the background of the present dispute leading up to a crippling strike of the City's school teachers and supervisors.

In paragraphs "20" through "24" plaintiffs assert that the dispute came to a head when the Governing Board and Administrator of the Ocean Hill-Brownsville Demonstration School District attempted to transfer 13 teachers and 6 administrators out of the district because of their actions in opposition to school decentralization. As a result of the attempted transfer of the 19 staff members, some 350 teachers in the district remained away from their jobs in sympathy during the last 6 weeks of school in the Spring of 1968. New teachers were recruited over the summer to replace most of those who left their positions in the Spring. By the opening of school in September, 1968 it appeared that approximately 100 of the original 350 wanted to return. The Governing Board, however, requested that these 100 teachers be assigned elsewhere.

Problems relating to these teachers led to a strike.

In paragraph "25" plaintiffs charge defendants Lindsay, Donovan and members of the Central Board of Education, with encouraging, aiding, and giving sanction to the illegal strike of the United Federation of Teachers, and that the teachers have not lost pay as a result of their illegal strike.

In paragraph "26" of the complaint it is alleged the specific demand of the defendant Shanker has been that notwithstanding the determination of the community to rid itself of teachers who took action contrary to the decentralization program and who illegally struck against their children, the Governing Board be compelled to place those teachers in teaching positions in the classrooms of the Ocean Hill-Brownsville District, and in order to compel adoption of his program the defendant Shanker is willing to prevent the functioning of the entire educational system of the City.

In paragraph "27" of the complaint the plaintiffs allege that notwithstanding that it must be acknowledged that any insistence that the said teachers be placed in teaching positions not only is contrary to the wishes of the community but is destructive of any possibility of successful development of the educational program of the Ocean Hill-Brownsville District, the defendants Central Board, Donovan, and Mayor Lindsay have yielded to continued threats of a third illegal strike by the defendant Shanker. Pursuant thereto, the defendants Central Board, Donovan, Mayor Lindsay and Chief of Police have sought to compel the placement of the replaced teachers in classrooms in the Ocean Hill-Brownsville District and, beginning October 7, 1968, have placed over 1,000 policemen in the said District. As a result of all the foregoing, education in the Ocean Hill-Brownsville District is at a standstill.

In paragraph "28" of the complaint the plaintiffs allege as follows:

The adoption of a plan of decentralization and the involvement of the community in the development of a new approach to education was designed to correct the denial of education for the Black and Puerto Rican children of the Ocean Hill-Brownsville District. The defendants have deprived these children of quality education as developed by the Ocean Hill-Brownsville District and have therefore deprived rights guaranteed under the Thirteenth and Fourteenth Amendments to the Constitution of the United States, to wit:

A. The defendants are attempting to impose the terms of an agreement ne-

gotiated by the New York Central Board of Education and the United Federation of Teachers, without the participation of the Ocean Hill-Brownsville Governing Board or any other representatives from the local communities of New York City having a stake in quality education through decentralized community control. The agreement itself and the attempt to enforce the agreement were not made to meet any lawful need or purpose, but expressly as a response to a strike declared illegal by the New York Supreme Court. This action was taken by the defendants knowing full well that the consequences thereof would be disruption of education in the Ocean Hill-Brownsville District, and the disruption of decentralization in the entire City of New York.

B. The attempt to impose and enforce the terms of the aforementioned agreement has in fact resulted in the disruption of the school system in Ocean Hill-Brownsville and in the education of the children who attend school in that District, to wit:

(1) Defendants have caused massive numbers of police to be stationed in and around the Ocean Hill-Brownsville schools to enforce the terms of the aforementioned agreement. The police have and are continuing to:

a. deny parents and other members of the community the right to enter the schools;

b. harass, intimidate, molest and arrest members of the community who wish to enter the schools;

(2) At least one school in the district has been closed;

(3) The Local Governing Board and the Unit Administrator, pursuant to a directive issued by the Central Board, have been suspended, thereby denying to plaintiffs the right to run and control schools through representatives of the community;

(4) Principals chosen by the community or its representatives have been suspended and removed from the District's schools pursuant to a directive issued by the Central Board.

C. Defendants' attempt to enforce the agreement, and the actions taken pursuant thereto, are designed to destroy and/or have the effect of destroying the rights of plaintiffs and the class they represent to achieve quality education through a system of decentralized community control of the schools in New York City.

In paragraph "29" plaintiffs assert their basic position, which is, that the 13th and 14th Amendments impose on defendants a duty not to interfere with the development of quality education for Black and Spanish-speaking children of New York and equality of education with White children. And finally, the Amendments also impose an affirmative duty to develop, support and protect quality and equality of education for the Black and Spanish-speaking children of New York.

On the basis of the complaint and the order to show cause, the plaintiffs ask that this Court issue a preliminary and permanent injunction enjoining the defendants, their attorneys, employees and agents, acting individually or in concert from:

(1) engaging in conduct designed to deny and/or having the effect of denying plaintiffs and the class they represent their Thirteenth and Fourteenth Amendment rights to insure quality and equality of education for their children and the children of all minority groups residing in the City of New York;

(2) attempting to impose the terms of a negotiated settlement arrived at between the New York Central Board of Education and the United Federation of Teachers without the participation of the Ocean Hill-Brownsville Local School Board or any other representatives from the local communities of New York City having a stake in quality education through decentralized community control;

(3) taking any action to compel the plaintiffs to retain within the School

District teachers whom the Governing Board has determined should be transferred out of the District;

(4) stationing police in and around the Ocean Hill-Brownsville schools to enforce the terms of the aforementioned agreement pursuant to a settlement of a strike declared illegal by the New York State Supreme Court;

(5) encouraging, aiding and giving sanction to the strike declared illegal by the New York Supreme Court by:

a) paying those teachers who struck the Ocean Hill-Brownsville schools in the Spring of 1968;

b) rearranging the school year of 1968–69 in a fashion that permits the teachers who struck the schools in the Fall of 1968 to be paid for most of the days schools were closed as a result of the strike declared illegal;

(6) continuing to enforce the suspension and/or removal of principals of the Ocean Hill-Brownsville schools and the Unit Administrator, Rhody McCoy, selected by the community and/or community representatives;

(7) otherwise threatening, intimidating, and/or harassing plaintiffs by actions designed to deny and/or have the effect of denying to plaintiffs the system of quality education in effect at the Ocean Hill-Brownsville School District prior to defendants' intervention therein.

An understanding of the legal status of the Ocean Hill Board is essential to an appraisal of the legal sufficiency of plaintiffs' attempts to state a cause of action predicated upon a denial of equal protection.

Until the Marchi Act (Laws 1968, Ch. 568, effective June 5, 1968) was enacted, there was nothing in the Education Law or any other statute authorizing (a) the establishment of any such local board as a body having official powers or (b) the exercise of any educational or other powers by such a local board or (c) the delegation of any of the powers of the Board of Education to such a local board.

During the entire period involved, therefore, and in the Spring of 1968 when the Ocean Hill Board first purported to "dismiss" and then "transfer" 19 teachers and supervisors, it had no legal or governmental powers and no status other than as an unofficial body of citizen advisors. The Ocean Hill demonstration project, as then existing, consisted of the operation of a special group of schools by and under the control of Board of Education personnel, with the Ocean Hill Board acting in an advisory capacity.

The Marchi Act authorizes the Board of Education, with the approval of the Regents, to delegate functions, powers and duties of that Board to local boards until June 30, 1969 and the Board of Education on September 4, 1968, adopted a resolution providing for delegation of certain of its functions, powers and duties to local boards (Exhibit C attached to Donovan affidavit). The Regents approved this delegation on October 17, 1968, effective October 18, 1968.

The Unit Administrator of the district, Mr. McCoy is a temporary appointee employed by the Board of Education (Donovan affidavit, par. 10). As such an employee, he is required to perform his duties under the direction and supervision of the Superintendent of Schools (Education Law, § 2566, McKinney's Consol.Laws, c. 16, Subd. 6) and subject to the directions of the Board of Education (Education Law, § 2552, § 2554, Subd. 15, par. a).

It is well established in this State that it is unlawful for any public official or body, without statutory authorization, to attempt to delegate its governmental powers. Matter of Behringer v. Parisi, 5 N.Y.2d 147, 151, 182 N.Y.S.2d 365, 156 N.E.2d 71 (1959); Matter of Blount v. Forbes, 250 App. Div. 15, 293 N.Y.S. 319 (1st Dept., 1937). Dealings between the Board of Education and the Ocean Hill Board could not result in any such delegation, since no statute permitted such a conferral. Moreover, the Board of Educa-

tion never adopted any resolution delegating any powers to the Ocean Hill Board, except for the September 4, 1968 resolution which was approved by the Regents. Accordingly, the Ocean Hill Board has only such powers as were delegated by the September 4, 1968 resolution, plus the power to appoint a local superintendent of schools, as conferred by the Marchi Act.

The witnesses of the plaintiff testified in substance that the Ocean Hill-Brownsville area is a poor section of the City, having a large majority of Black and Puerto Rican inhabitants; that most of the children in the 8 schools in the district are Black and Puerto Rican; that some of the schools selected for inclusion in the district were among the worst in the area; that prior to the time the demonstration project began functioning in the Fall of 1967, there were high rates of pupil and teacher absenteeism, there were high rates of student dropouts, serious disciplinary problems existed, and the students' performance was frequently below grade level; that, in addition, the schools were over-crowded, run-down, and understaffed; that during the course of this past year, however, most of these problems have been relieved or have disappeared altogether; that new I.S. 55 was opened in the district in February 1968; that a pupil-teacher ratio of about 19 to 1 has been achieved; that parents have taken a much greater interest in the operation of the schools; new programs and new methods of teaching have been devised to improve student performance; special classes have been introduced for the more gifted pupils; absenteeism, disciplinary problems and the drop-out rate have shown marked improvement. In general, the witnesses from the district testified that remarkable progress had been made during the past year in the schools in that area.

Mr. John Doar, President of the Board of Education, was called for the purpose of discussing proposals that have been considered by the Central Board and the Mayor to close I.S. 271 on a temporary basis. Mr. Doar testified that the Board had not approved the closing of I.S. 271 for educational reasons but it did recognize that the Mayor had the authority to close I.S. 271, if necessary, for reasons of public safety.

Mr. Doar testified that it was his understanding that in the event the Mayor should close I.S. 271 it would be reopened as soon as safety factors would permit.

The facts as they unfold are substantially as set forth in the affidavit of Dr. Bernard E. Donovan, Superintendent of Schools, dated October 15, 1968. One must first read his affidavit to get a view of the broad picture and then the papers and testimony as adduced to find out whether there is a valid complaint upon which this Court can assume jurisdiction.

It appears from the papers before this Court that in May, 1968, the Ocean Hill Board notified 13 teachers and 6 supervisors of the district that they were "dismissed". This action was taken without charges or a hearing on the basis of a claim by the Ocean Hill Board that these employees were unfit for service. Subsequently the Ocean Hill Board changed this action to a request for a transfer of these employees on the ground of claimed unfitness.

In accordance with the usual procedure of the Board of Education in cases where allegations of dereliction are made against teachers and supervisors, the Superintendent of Schools refused to transfer these employees without an investigation of the allegations and an opportunity for the employees to respond to the accusations.

The Ocean Hill Board filed charges of unfitness against 10 of the accused 19 employees, the other 9 employees having been eliminated from the attempted ouster by voluntary transfer or otherwise. The teachers were acquitted of these charges after a trial before Mr. Justice Rivers, acting as a Trial Examiner for the Board of Education.

Judge Rivers recommended to the Board of Education that the demand of the Ocean Hill Board for the transfer of the teachers be rejected. (The report and recommendations of Judge Francis E. Rivers, dated August 26, 1968, is attached to the affidavit of Abraham Wilner, Assistant Superintendent of Schools, in charge of personnel, dated October 21, 1968.)

The Superintendent of Schools and the Board of Education accepted the recommendation of Judge Rivers.

Despite the acquittal, the Ocean Hill Board, prior to the opening of the Fall, 1968, term, declared that it would not permit the 10 teachers to return to their teaching positions and, in addition, that it would also oust approximately 100 teachers who absented themselves from their schools in the Spring of 1968 in protest against the attempted transfer.

The Ocean Hill Board did not have, at the time of these actions, and up to the time of the conclusion of this hearing did not possess, any legal power, jurisdiction or authority (a) to transfer teachers out of the schools of the Ocean Hill-Brownsville district or (b) to determine the fitness and competency of teachers, or (c) to refuse teaching assignments to any teacher duly assigned to the district or (d) to countermand orders of the Board of Education on any subject.

The Board of Education, after efforts to persuade the Ocean Hill Board and the Unit Administrator, Mr. McCoy, to allow these teachers to return to their rightful teaching positions, submitted the matter to the State Commissioner of Education. The Commissioner, after reviewing the facts and hearing the contentions of the Ocean Hill Board, the Board of Education and the United Federation of Teachers, issued a determination on September 14, 1968, ruling (a) that the efforts of the Ocean Hill Board to oust the teachers were illegal and contrary to sound educational principles, (b) that this Board should be suspended temporarily, and (c) that the 10 teach-

ers be temporarily assigned outside the Ocean Hill District.

Under the broad jurisdiction to review educational matters conferred upon the Commissioner by the Education Law, including §§ 310 and 311 thereof (See Matter of Vetere v. Allen, 15 N.Y.2d 259, at pp. 265–266, 258 N.Y.S.2d 77, 206 N.E.2d 174 (1965)), he had full authority to review and determine all aspects of the legality and propriety of the attempted transfer of the teachers. The Commissioner may set aside a transfer of a teacher if he finds that it was arbitrarily made. (55 St.Dept. 581). In effect, therefore, the Commissioner sustained the refusal of the Board of Education and the Superintendent of Schools to permit the ouster.

Under New York Law, the determination of the Commissioner rejecting the claims and demands of the Ocean Hill Board as to the teachers is conclusive upon the Board and will not be set aside by the New York courts unless purely arbitrary. Matter of Chapin v. Board of Education, 291 N.Y. 241, 52 N.E.2d 113 (1943); Matter of Vetere v. Allen, supra.

On September 15, 1968, the Board of Education issued directives carrying out the determinations of the Commissioner of Education and notified the Ocean Hill Board members of this action.

On September 20, 1968, the Board of Education, with the approval of the Commissioner of Education, revoked the temporary suspension of the members of the Ocean Hill Board and directed that all 110 teachers sought to be excluded be reassigned to teaching duties in the Ocean Hill District.

Notwithstanding Board of Education orders issued on September 20, 1968 to the Ocean Hill Board and the Unit Administrator of the Ocean Hill District, Mr. McCoy, that the 10 acquitted teachers and the 100 other teachers be given teaching assignments in the schools of the area, the Ocean Hill Board and Mr. McCoy defied the Board of Education

and during the week preceding October 6th, 1968 purported to order that these teachers be refused teaching assignments. The Ocean Hill Board was suspended by the Board of Education for 30 days on October 6, 1968, following the attempt of the Ocean Hill Board to countermand these orders of the Board of Education.

While the above-described events were occurring, the full remedies available under the law were being invoked against the illegal strike being conducted by the United Federation of Teachers in protest against the unlawful attempts of the Ocean Hill Board to oust the 110 teachers.

The above-described actions and events, commencing with the move of the Ocean Hill Board to oust the 13 teachers and 6 supervisors in May, 1968, are matters of public record and common knowledge and are set forth at length in the affidavit of Superintendent Donovan sworn to on October 15, 1968 and in the Exhibits attached thereto. The allegations of the complaint, other than conclusions of law set forth by plaintiffs, are not in any significant way at variance with the above account of the actions of the Ocean Hill Board, the Board of Education and the Commissioner of Education.

■■■ This Court recognizes that there is a difference in the question of whether or not the Court has jurisdiction and whether or not the complaint sets forth a claim upon which relief can be granted. And yet unavoidably the substance of the complaint must be examined to answer the question of jurisdiction. The jurisdictional allegations of the pleader will not suffice. The nature of the inquiry to be made by the Court was described by Mr. Justice Cardozo in Gully v. First National Bank, 299 U.S. 109, at pp. 112–113, 57 S.Ct. 96, at pp. 97–98, 81 L.Ed. 70, as follows:

"How and when a case arises 'under the Constitution or laws of the United States' has been much considered in the books. Some tests are well established. To bring a case within the

statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. Starin v. City of New York, 115 U.S. 248, 257, 6 S.Ct. 28, 29 L.Ed. 388; First National Bank of Canton, Pa. v. Williams, 252 U.S. 504, 512, 40 S.Ct. 372, 64 L.Ed. 690. The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. Id.; King County, Wash. v. Seattle School District, 263 U.S. 361, 363, 364, 44 S.Ct. 127, 68 L.Ed. 339. A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto (City of New Orleans v. Benjamin, 153 U.S. 411, 424, 14 S.Ct. 905, 38 L. Ed. 764; Defiance Water Co. v. City of Defiance, 191 U.S. 184, 191, 24 S. Ct. 63, 48 L.Ed. 140; Joy v. City of St. Louis, 201 U.S. 332, 26 S.Ct. 478, 50 L.Ed. 776; City and County of Denver v. New York Trust Co., 229 U.S. 123, 133, 33 S.Ct. 657, 57 L.Ed. 1101), and the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal. (Tennessee v. Union & Planters Bank, 152 U.S. 454, 14 S.Ct. 654, 38 L.Ed. 511; Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126; The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716; Taylor v. Anderson, 234 U.S. 74, 34 S.Ct. 724, 58 L.Ed. 1218.) Indeed, the complaint itself will not avail as a basis of jurisdiction in so far as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense. Devine v. City of Los Angeles, 202 U.S. 313, 334, 26 S.Ct. 652, 50 L. Ed. 1046; The Fair v. Kohler Die & Specialty Co., supra."

■■■ Where a claim is properly made, as arising under the Constitution and laws of the United States, the Court

should of course take jurisdiction even if the claim would be subject to dismissal on motion. In Bell v. Hood, 327 U.S. 678, 681–683, 66 S.Ct. 773, 775–776, 90 L.Ed. 939 (1946) Mr. Justice Black described the procedure as follows:

" * * *. Before deciding that there is no jurisdiction, the District Court must look to the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and laws of the United States. For to that extent 'the party who brings a suit is master to decide what law he will rely upon and * * does determine whether he will bring a 'suit arising under' the * * * [Constitution or laws] of the United States by his declaration or bill.' The Fair v. Kohler Die Co., 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716. Though the mere failure to set out the federal or Constitutional claims as specifically as petitioners have done would not always be conclusive against the party bringing the suit, where the complaint, as here, is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions later noted, must entertain the suit. Thus allegations far less specific than the ones in the complaint before us have been held adequate to show that the matter in controversy arose under the Constitution of the United States. Wiley v. Sinkler, 179 U.S. 58, 64–65, 21 S.Ct. 17, 45 L.Ed. 84; Swafford v. Templeton, 185 U.S. 487, 491–492, 22 S.Ct. 783, 785, 46 L.Ed. 1005. The reason for this is that the court must assume jurisdiction to decide whether the allegations state a cause of action on which the court can grant relief as well as to determine issues of fact arising in the controversy.

Jurisdiction, therefore, is not defeated as respondents seem to contend, by the possibility that the averments· might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction. Swafford v. Templeton, 185 U.S. 487, 493, 494, 22 S.Ct. 783, 46 L.Ed. 1005; Binderup v. Pathe Exchange, 263 U.S. 291, 305–308, 44 S.Ct. 96, 68 L.Ed. 308. The previously carved out exceptions are that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous. * * "

■ Where, however, it is obvious that the claim of federal jurisdiction is insubstantial and made only to acquire jurisdiction, the proper course is to dismiss the complaint as was done in Mainelli v. Providence Journal Company, 312 F.2d 3 (1st Cir. 1962) where the Court stated (312 F.2d 5–6):

"On the face of the complaint itself it is evident that the claim of federal jurisdiction is wholly insubstantial and frivolous and could have been made only for jurisdictional purposes. In this situation * * * the proper course is to dismiss for lack of jurisdiction without reaching the question whether the complaint states a claim upon which relief can be granted."

The constitutional issues involved go back to the Dred Scott decision (19 How. 393, 60 U.S. 393, 15 L.Ed. 691, 1856), in which it was held that the slaves were not entitled to the rights of citi-

zens and that not even Acts of Congress could change the situation; that only an Amendment to the Constitution could free slaves from the status of property and give them the rights of citizens.

The 13th and 14th Amendments were thereafter adopted:

## AMENDMENT XIII.

Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation.

The section of the 14th Amendment involved in this matter is Section 1. of said Amendment:

## AMENDMENT XIV.

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No ·State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Plaintiffs' contentions, admissions, proof and exhibits raise a serious question as to the relevance of these Amendments to the facts involved.

The plaintiffs admit that the State of New York was not made a party since there is no claim in this proceeding that any New York Law is unconstitutional or in any way violative of the Constitution of the United States.

The plaintiffs concede that decentralization of the New York City School system is not the only solution to the problems that exist. It is one suggestion that can be experimented with.

The plaintiffs reluctantly concede that centralization, as it has existed, is not inherently unconstitutional so that one could sue the state for decentralization assuming the Marchi Law had not been passed.

▪▪▪ In the well-known segregation cases, the alternative was desegregation. We cannot assume that decentralization is the only constitutional alternative if we say centralization is unconstitutional.

▪▪▪ It cannot be alleged that education is a right under the Constitution. However, when a state undertakes to provide public education it must provide it equally. (Brown v. Board of Education, 347 U.S. 483, 486, 74 S.Ct. 686, 98 L.Ed. 873), or it would be violative of the 14th Amendment.

The Plaintiffs seem to set out what is essentially a three-part theory.

(1) Their basic assertion is that the centralized school system existing before the decentralization experiment violated:

(a) The 13th Amendment in that "quality" education was not given the Black and Spanish-speaking children of New York and that this meant the imposition of "a badge or indicia" of slavery, contrary to the 13th Amendment mandate.

(b) The 14th Amendment in that "equality" of education was denied children because the present system of education did not respond to the particular educational needs of Black and Spanish-speaking children, resulting in high illiteracy rates;

(2) The Ocean Hill project was instituted to correct these constitutional deficiencies and is succeeding; and

(3) Any interference with the operating of the Ocean Hill project is unconstitutional, as it forces the children back to the unconstitutional system previously existing.

None of these allegations, considering all the papers, pleadings, exhibits and testimony adduced, give this Court jurisdiction.

There has been no allegation made, or proven, that would tend to show any act, overt or subtle, that would violate the 13th Amendment.

While it might be a violation of the 13th Amendment for the state—or individuals—to deny to Negroes the *right* to education, the complaint nowhere alleges that this is the case. Neither do we have the situation, as in Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), where the state is standing aside and permitting individuals to deny basic right to citizens. Nor is there indicated the extent to which the differences in education alleged are attributable to the centralized school system. Rather, we have the bald assertion that the New York school system violates the 13th Amendment because of the end product of the system.

There has been no allegation made, or proven, that could lead to the position that anyone either conspired or acted under color of state law to *deny* equal educational rights to anyone. There has been no allegation that less qualified teachers were forced, in a discriminatory manner, upon Negro schools, nor of any other arbitrary, discriminatory, or capricious action that could be deemed to violate the right of the inhabitants of the experimental district to equality of education. The mere showing that inequality exists, without more, does not make out a case of constitutional violations.

The plaintiffs cannot make out a case for the exercise of Federal jurisdiction under the various statutes cited in paragraph "12" of their complaint as the claimed basis of jurisdiction herein, unless they allege in their complaint facts establishing a violation of rights guaranteed by the Constitution or laws of the United States. When the complaint is analyzed in the light of matters of public record and the facts disclosed by the papers and the testimony before this Court, it is evident that the complaint fails to show any violation of plaintiffs' federal rights. A review of all the statutes cited by the plaintiffs fails to show

how any of the acts alleged or proven come within the purview of such statutes. All said sections are dealt with thoroughly and at length by the briefs submitted by the parties, and this Court sees no reason to repeat each argument. However, the Court feels they are not applicable to the present case.

The plaintiffs allege that the complaint is clearly drawn in a manner that seeks relief under the Constitution of the United States. To bring a case within the statute, a right or immunity created by the Constitution must be an element, and an essential one, of the plaintiffs' cause of action. (Gully v. First National, supra.)

The plaintiffs cite the case of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, which states:

> Dismissal of the complaint upon the ground of lack of jurisdiction of the subject matter would, therefore, be justified only if that claim were 'so attenuated and unsubstantial as to be absolutely devoid of merit'.

In the *Baker* case, however, the very nature of the controversy was federal and jurisdiction existed. The "one man one vote" principle was involved and it followed that all are entitled to the equal protection of the laws under the 14th Amendment.

■ The injunctive relief sought would require this Court to order the Board of Education of the City of New York to take actions which would be illegal under the Education Law of the State of New York. Education Law of the State of New York, §§ 2554(2), 2564, 2566(5) and 3012(1). For that reason, it cannot properly be found that the complaint sets forth a claim upon which relief could be granted. United States v. Rizzo, 119 F.Supp 736 (U.S. D.C., E.D.N.Y.1954).

In the one instance where relief is sought which does not involve the action and policies of the Board of Education of the City of New York, i. e., the removal of police from school locations in the Ocean Hill-Brownsville Dis-

trict, the facts before the Court are such as to show that the basis for this demand is not merited. In such a situation a proceeding is properly dismissed. See Fay v. Douds, 172 F.2d 720 (C.A. 2) per Learned Hand 1949.

As the Court wrote in the case of Douds v. Local 294, IBT, 75 F.Supp. 414 at 417 (U.S.D.C., N.D.N.Y.):

"Arguments addressed to the fairness or efficiency of the statute are of no value here. Congress alone has the legislative power. The courts may only construe, apply and enforce the statute in accordance with the language and intent thereof. They are not concerned with whether or not the litigants consider the statute either good or bad."

It appears to this Court that even if it could be said that the claim herein is not unsubstantial nor frivolous it is made solely for the purpose of obtaining jurisdiction, especially since no act has been shown to be violative of the 13th and 14th Amendments, no Amendment bars specifically any of the acts alleged, and no federal statute is claimed to have been violated. Indeed, the complaint itself will not avail as a basis for jurisdiction in so far as it goes beyond a statement of the plaintiffs' cause of action and anticipates or replies to a probable defense.

The plaintiffs' claim that the nature of their Constitutional rights and the substantiality of their claims warrant that the Court assume jurisdiction. They rely on Jones v. Mayer Realty, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189; Brown v. Board of Education, 347 U.S. 483, 486, 74 S.Ct. 686: United States v. Jefferson County Board of Education, 5 Cir., 372 F.2d 836; and Hobson v. Hansen, D.C., 269 F.Supp. 401.

This Court fails to see the similarity in any of these cases with the case at bar.

In the *Brown* case, supra, the Court declared school segregation to be against the equal protection of the laws guaranteed by the 14th Amendment, even if tangible factors are equal. The Court also stated:

"Today, education is perhaps the most important function of state and local governments." (347 U.S. p. 493, 74 S.Ct. p. 691) "It is the very foundation of good citizenship. * * * In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, *where the state has undertaken to provide it,* is a right which must be made available to all on equal terms." (Emphasis added.)

With relation to the present case, education, it seems, is not a constitutional right in and of itself, but must be equally provided if provided at all.

Segregation obviously connotes inferiority. But no finding or general feeling is present stating that centralized school systems are *inherently* inferior.

Plaintiffs do not point to a federal statute that defines and protects the rights they claim in the context presented here. Basically they rely on the 13th and 14th Amendments themselves. This claims too much. These Amendments are self-executing in fundamental but limited areas only. Contrast the situation before the Court in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) relied upon by plaintiffs, where Congress had passed a statute authorized by the 13th Amendment, 42 U.S.C. § 1982, to give all citizens equal rights in the purchase, lease or sale of real property. There the statute was intended to relieve former slaves of one of the disabilities of their prior status and give them equal opportunity with white persons.

Unaided by the statute it would appear impossible for the Court to have based relief on the 13th Amendment alone.

By the same token, in the present case there is no statute to give plaintiffs the rights they claim. When viewed in light

of the facts pleaded and presented at the trial neither the 13th nor 14th Amendment affords a basis for jurisdiction.

Time and again during the course of the arguments and the hearing, the Court offered the plaintiffs the opportunity to testify despite the Court's uncertainty as to whether the testimony was or would become relevant. T. 258 "I am permitting them an opportunity to at least give the Court some background in preparation for, I hope, will be a move on the plaintiffs' part here to show some violative acts;" T. 235 "* * on the question of jurisdiction, I have to give a little bit of latitude to the plaintiffs, an opportunity to them, to do what they feel is necessary in order to bring the issue to a zeroing-in point * * *", "* * * I think they should be entitled to bring in a little bit of background, * * * and then try to join it with any overt act which they claim then are violative of the 13th and 14th Amendments;" T. 521 "we have to have something more specific;" T. 523 (After testimony on October 21st, October 22d, a short hearing on October 23rd, October 24th, and many hours on October 28th, the Court still found it necessary to say "let us get to the matter before us").

At a later time the Court said: "Now, Mr. Stavis, I have given you a great deal of latitude. I have given everybody a great deal of latitude, but, I would like to, as I said before, start to zero-in on the relevant matters." T. 294.

"Let us start getting to the point where it becomes a little more relevant and not a little more ethereal." T. 295.

The testimony and the exhibits show that for a variety of reasons students in the Ocean Hill-Brownsville area have had many difficulties in prior years but that things are now improving. There have been overcrowded schools in the District and for that matter in the other districts in Brooklyn (defendants' Ex. B). The six elementary schools in the District are old but the Board of Education has approved new construction to replace each of them at a cost for construction estimated at three million dollars each (defendants' Exs. A and E, McCoy testimony pp. 125, 434–438).

Students in many schools of the City have performed below expectations on City-wide tests. The reasons for these results are explored in plaintiffs' exhibit 6 where it is stated (pp. 2–3 "Summary of Citywide Test Results for 1966–67"):

"When the results of the standardized reading achievement tests are considered in proper relationship to the other sources of information about the pupil, it is clear that the test results cannot be considered as an unqualified indication of the effectiveness of instruction. In the first place, the results refer to only a part of the pupil's general achievement. Secondly, in addition to the instructional effectiveness of the teacher there are other potent factors which strongly influence test results. Even a partial list of such factors will serve as a brief indication of the many factors other than the teaching during the period tested, which influence test results:

The child's pre-school experiences

The pupil's past educational history

The pupil's mobility from school to school

The quality and adequacy of instructional materials

The suitability of the physical plant

The pupil's language background, including Non-English speaking experiences

The pupil's attendance

The general out-of-school environment of the pupil.

"Conversely, it is pertinent to observe that the factors of race or nationality, in themselves, are not causes of either high or low reading scores. If some ethnic groups of pupils are economically disadvantaged, the scores, on a group basis, often are below average. It is clear that this low achievement stems from the debilitating economic conditions, among other factors, and not from the fact of race."

■ Plaintiffs claim that decentralization legislation enacted by the Legislature was intended for the purpose of improving the quality of education for Black and Spanish-speaking children.

There is no evidence of this—it is an error. The Legislature was legislating for all children of our State, no matter what their color or national origin.

It is error for the plaintiffs to allege, as they do in paragraph "16" of the complaint as follows:

"16. The adoption of an educational system based upon decentralization and the involvement of the local community is an attempt to correct the denial of rights under the Thirteenth and Fourteenth Amendments to the United States Constitution hereinabove set forth."

There was no finding by the Legislature that there was a denial of the 13th and 14th Amendment rights. If one reads the Marchi Act and the Education Law, § 2553, the true meaning of the law is patent.

It must be recognized that the results of the Ocean Hill experiment have been greatly encouraging. The concept of community involvement is one that appears to have great possibilities. But even admitting all of this, the complaint, the papers and the testimony adduced do not allege any facts that can lead this Court to the conclusion that the present situation is one involving the danger of destruction of the Ocean Hill experiment. There has been no showing that the presence of the police in any way stifles the experiment. And while the competence of Mr. McCoy as an Educator is apparent, neither his removal nor that of the principals of the schools has been shown to be part of an attempt to destroy the experiment. The concept and its operation can certainly continue even if certain individuals are no longer part of the experiment. Mr. McCoy has no constitutional right to his job.

The Ocean Hill experiment is just that, an experiment. It is an attempt to see how the effectiveness of the educational structure may be improved. But the State should not be put into a constitutional straight-jacket, forbidding it from attempting other experiments. The alternative to segregation was some form of integration—that was the clear alternative. There is no such obvious solution to the education problems of the large cities. The State should not be prevented from ending one experiment and trying others, if the action is taken in good faith, without discriminatory intent or result.

The acts complained of by plaintiffs are not sufficient to establish the jurisdiction of this Court.

*The Suspension of the Governing Board.*

The Governing Board was suspended only after it had refused to return a number of the disputed teachers to teaching assignments despite contrary instructions of the Central Board issued after the charges against the original 10 teachers had been dismissed for insufficient evidence. The validity of this suspension was attacked in State Court but the suspension was sustained. Ocean Hill-Brownsville Governing Board v. Board of Education, 30 A.D.2d 447, 294 N.Y.S.2d 134 (1968), Education Law § 2564, subd. 2.

*The Reassignment of the Unit Administrator.*

Here, too, the reassignment was required when Mr. McCoy stated he would obey the instructions of the Governing

Board rather than those of the Central Board on the assignment of the disputed teachers (see Defendants' Ex. C, Mc-Coy testimony p. 449). Mr. McCoy has, since this hearing, been reinstated.

*The Reassignment of the Principals.*

The majority of principals have been returned to their schools in the District after a brief period.

*The Closing of I.S. 271.*

I.S. 271 was closed briefly because of disturbances in and around the school. It has been reopened. This issue is moot.

*Stationing Police in the Ocean Hill-Brownsville District.*

The question of assignment of police is a matter of public safety best left to the judgment of the Police Commissioner and the Mayor. Where public disorder is likely or actually taking place, it would be shortsighted to say the least not to provide police in sufficient numbers to protect life and property in the area. Police are in short supply and will be assigned to the area only while the need for their presence is manifest.

*Financial Penalties for Striking Teachers.*

Salary payments to striking teachers have been stopped. A Taylor Act proceeding is pending against the United Federation of Teachers in New York County. The school schedule will be extended so that some of the time lost may be made up by the teachers. However that may be, the lost time needs to be made up for the benefit of the children and to prevent the loss of State aid (Donovan affidavit).

*Conducting Separate Negotiations with the United Federation of Teachers.*

By now it is apparent that the parties have negotiated together and separately. Mayor Lindsay, the Board of Education and Dr. Donovan have met at great length with all parties to the dispute and with the Commissioner of Education. Negotiations where all parties were present were conducted in the presence of the Court. The Board of Education has a contract with the United Federation of Teachers. The contracting parties are not barred by any provision of law from conducting their negotiations in the absence of the plaintiffs.

The foregoing items are the more important "overt acts" disclosed by the record that might be claimed to support plaintiffs' allegations as to the jurisdiction of this Court and their claim for injunctive and declaratory relief.

Defendants, other than Albert Shanker, are public officials with duties imposed upon them by law. They cannot abdicate their responsibilities or delegate them to local groups, however well motivated, in the absence of statutory authority. Plaintiffs proceeded beyond their authority and when stopped claimed a violation of their constitutional rights. There has been no showing made before this Court to justify their claim even though the Court was most liberal in the latitude it gave plaintiffs for the production of testimony and exhibits.

The plaintiffs claim that in recognition of the constitutional obligation under the 13th Amendment, the New York State Legislature and the New York City Central Board authorized and established the Ocean Hill-Brownsville experimental district; that this was done pursuant to acceptance by the Legislature and said Board of the proposal that decentralization is an important method of eliminating for black children the badge of inferiority attendant to an inferior education; and that it is the obligation of this Court to protect the rights of plaintiffs by restraining the defendants from interference with or further disruption of the educational system now in progress in the Ocean Hill-Brownsville district.

This is not consistent with the facts and the laws of the State of New York.

The plaintiffs also allege a violation of the 14th Amendment and claim that

the New York Legislature passed the Marchi law, in which it was recognized, as a legislative finding, that decentralization of the New York City Schools was required as a method of insuring to minority group children the right to receive equal education; that the defendants are destroying decentralization or encouraging its destruction.

These facts are not consistent with the law cited or the proof adduced.

The plaintiffs rely upon Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830. In that case, the Supreme Court of the United States reviewed a decision of the California Supreme Court which held that an article of the California Constitution violated the equal protection clause of the 14th Amendment. The Supreme Court held that the article in the California Constitution, prohibiting the state from denying the right of any person to sell, base or rent his real property to anyone he chooses, would involve the state in private racial discrimination to an unconstitutional degree.

It appears that by vote in 1964, the people of California placed in the state Constitution a provision forbidding the state from interfering with the right of persons to sell their real property to whomever they wished. The Supreme Court held that this provision gave the people the right to discriminate, free from state control, and that this meant that the state would be involved in "private racial discrimination to an unconstitutional degree." It is necessary "for a court to assess the potential impact of official action in determining whether the state has significantly involved itself with invidious discriminations."

If the education of the Negroes is so bad as to violate the 13th or 14th Amendment, the state cannot hide behind its laws, or let popular opinion, strikes, etc., make it refrain from correcting the wrongs, else by its very disassociation with events, it is countenancing, and a part of, the wrongs involved.

These facts are in no way similar to the issues in the case before this Court.

The plaintiffs also make much of their reliance upon the Cooper v. Aaron case, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 1958. This is the case arising out of the Little Rock crisis. After the *Brown* decision, the Little Rock School Board prepared a desegregation plan. The Governor surrounded the schools with troops and tensions became unmanageable. The School Board asked Negro students to stay away from school until the legal problems were settled. A suit was brought to enjoin the Governor and National Guard from attempting to prevent obedience to the court's order. After further problems, the President sent federal troops to Little Rock.

After all of this, the School Board and Superintendent of Schools filed a petition in the District Court seeking a postponement of the desegregation program because of extreme public hostility, which prevented a school program from being carried out. The District Court found that there was "chaos, bedlam and turmoil" in the schools, with violence against the Negro students and unrest among the teachers and administrators that affected the educational program. The delay was granted and the case taken to the Supreme Court.

The Court held that: from the point of view of the 14th Amendment, members of the School Board and Superintendent of Schools stand as agents of the state; their good faith would not constitute legal excuse for delay in implementing desegregation plans, where the vindication of constitutional rights was rendered difficult by other state officials; the constitutional rights of respondents are not to be sacrificed or yielded to the violence and disorder which followed upon the actions of the Governor and Legislature, especially when the problems could have been brought under control by state action; and no agency of the state could deny to any person the equal protection of the laws (14th Amendment).

The *Cooper* case is different from the present case. The problems in Little Rock causing the School Board's request were "considered in light of the fact * * * that the conditions * * * are directly traceable to the actions of legislators and executive officials of the State of Arkansas, taken in their official capacities * * *." (358 U.S. 1, at 15, 78 S.Ct. 1401, at 1408.)

The request for a delay involved a defiance of a direct mandate of the Supreme Court—end segregation in the schools. There is here no defiance of any such concrete constitutional mandate, if any at all. No one has yet made the finding that centralization of schools is as heinous as is segregation. It is yet to be established—indeed, it's the very question we must *first* consider—that a *constitutional* right has been denied to anybody.

On the other hand, New York State has led the way in trying to achieve quality education for all. The Marchi Act, a move towards school decentralization, is one such step. For the first time it gives the Board of Education a lawful basis for the delegation of some of its functions and duties to local school boards. The Central Board has adopted a decentralization program and the Regents approved it, effective October 18, 1968 (Loflin affidavit). So long as local school boards operate within the scope of the powers delegated to them and the relevant provisions of the Education Law, there will be no unlawful "interference" with their activities by these defendants. The Board of Education and the Mayor are dedicated to the support of school decentralization and the desire to bring quality education to all of the children of this City. Obviously there have been serious and unfortunate disputes between the parties but they did not arise under, or by virtue of any deprivation of rights protected by, the Constitution or laws of the United States.

This Court is very much aware of the legislative action in the field of education for the past many years.

For the school year 1958–59 the state budget allowed $585 million total aid to education for the state. Total aid to education for New York City for that period was $159 million.

For the school year 1964–65 the state budget allowed $1,062 million total aid to education for the state. Total aid to education for New York City for that period was $262 million.

The state-wide increase for that six-year period was 82 per centum.

The New York City increase for the same six-year period was 65 per centum.

During the succeeding four-year period the aid was greater and the percentage to New York City rose.

For the school year 1968–69 the state budget allowed $1,888 million total aid to education for the state. Total aid to education for New York City for that period was $509 million.

The state-wide increase for the four-year period was 78 per centum.

The New York City increase for the four-year period was 95 per centum.

There can be no argument that our state has not done much by way of financial aid to education in the light of its many other problems.

All of the financial aid set forth above is over and above the millions granted to New York City for the so-called "SEEK" program, which has proven to be most successful. This program is exactly what the title suggests—seek out the less fortunate, those whose marks do not qualify them for higher education and give them a chance to make good. One only needs to make inquiry about this program to find that the word discrimination is a word of the past in New York City.

Likewise, particularly in the last ten years, all New York laws having something to do with education granted the same privileges to all, regardless of race or place of national origin.

In fact, there is no claim in the matter before the Court that any law of New York discriminates or is violative of any United States Constitutional provision or United States Statute.

One can, therefore, ask, why did the Marchi Law (Ch. 568, L. of 1968) come about?

For many years legislators sought more financial aid for New York City for education. There were those who argued that New York City was receiving its proper share under the existing formulae. New York City was receiving its share on the basis of one entity. The rest of the state was receiving theirs on school district and/or county basis. The property values in New York County were so high as compared to the other four counties in New York City, that, when it was figured in with the other four counties, it reduced New York City's aid share. However, if the aid could be measured on a county basis, the poorer county would receive more and not be affected by the richer county. This move was successful and aid was granted to New York City on a five-county basis. As a result, New York City received $104 million more than it would have received under the then-existing formula. This happened during the 1966 Session of the Legislature. A section of the law stated that in order to continue receiving aid on a five-county basis, New York City was directed to propose to the 1967 Session of the Legislature a program to decentralize New York City into a meaningful five-part system and not continue to have one school district and receive aid based upon five school districts.

During the 1967 Session of the Legislature many proposals were offered. There were the so-called Regents Plan, the Bundy Plan, the New York City Plan and many others. No plan could be agreed upon and a bill was passed which in substance extended the problem for another year. (Chapter 484, Laws of 1967).

The 1968 Session of the Legislature wrestled with the problem again and as a compromise the Marchi Bill was passed, which in substance extends the problem for another year.

One should take note that the problem went from one of finance and how to get New York City more money based on a five-county aid program to one of decentralization within counties as we now see it in the light of existing circumstances.

Pressure is now put on the Legislature to do something about decentralizing the entire New York City for local school district purposes, and properly so, but losing sight of the original finance problem which must also be settled or New York City will lose the additional aid.

The Marchi Bill took this into consideration and, in fact, the New York City allotment on the five-county basis was only permitted in order to get support for the Marchi Bill.

The Court will not go into the questions raised by the defendants such as "the appropriate remedy at law must be found in the State Courts" or "that adequate remedies at law are through the State Courts." This Court could certainly decide those questions, if it would reach that point.

The only question before the Court at this point is—does this Court have jurisdiction?

The motion this Court must now decide is the motion of the defendants to dismiss for want of jurisdiction, since it was made at the close of the plaintiffs' case on the question of jurisdiction.

Much of the relief sought by the plaintiffs is moot since the teachers' strike was settled.

On the basis of the foregoing, the motion of the defendants to dismiss for want of jurisdiction is granted and the proceeding dismissed.