Adam Clayton **POWELL**, Esther McCall, John W. Duncan, Robbie Clark, Martha P. Anderson, and Joseph Steele, suing for themselves and in behalf of all others similarly situated, Plaintiffs-Appellants,

v.

James M. **POWER**, Thomas Mallee, Maurice O'Rourke, and J. J. Duberstein, constituting the Board of Elections of the City of New York, and Charles B. Rangel, Defendants-Appellees.

No. 505, Docket 35671.

United States Court of Appeals, Second Circuit.

Argued Dec. 14, 1970.

Decided Dec. 23, 1970.

Henry R. Williams, New York City, for plaintiffs-appellants.

Harold Fisher, Brooklyn, N. Y., for defendants-appellees.

Before MOORE, KAUFMAN and HAYS, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Six voters in a Congressional primary election seek a federal remedy for errors committed by state election officials in permitting a number of individuals to cast ballots who under state law were not qualified to vote. The Voting Rights Act of 1965 and the Civil Rights Act of 1871, 42 U.S.C. § 1983, are said to authorize the federal courts to remedy such unintended irregularities. Finding no warrant for the plaintiffs' novel view of these enactments, we affirm the district court's denial of relief.

I.

In the 1970 Democratic primary election in New York's 18th Congressional District, Charles B. Rangel defeated the incumbent, Adam Clayton Powell, by a narrow margin.[1] In the 18th District,

1. 24,589 votes were cast as follows:

| | |
|---|---|
| Charles B. Rangel | 8,032 |
| Adam C. Powell | 7,882 |
| Ramon A. Martinez | 4.510 |
| Jesse Gray | 2,481 |
| John H. Young | 1.584 |
| | 24,589 |

unlike most others, only the Democratic party was conducting a primary election. Perhaps because of this unusual situation, state officials neglected to remove all the non-Democratic registration cards from the locked binders used at the polls, and a number of non-Democrats cast their votes in the primary election. Claiming that a different outcome would have resulted had these voters been excluded,[2] Powell invoked New York's statutory procedure for setting aside party nominations, Election Law McKinney's Consol.Laws, c. 17, §§ 145, 330(2). Because he failed to initiate this proceeding within ten days after the primary election, however, *id.* § 330(2), the Supreme Court, New York County, dismissed his petition on July 13. The Appellate Division affirmed unanimously, 35 A.D.2d 658, 313 N.Y.S. 2d 941, and leave to appeal to the New York Court of Appeals was denied. On October 22, twelve days before the general election, six pro-Powell voters (including the candidate himself) brought the present action alleging that their federal rights were violated by the inadvertent tallying of ballots cast by the unauthorized voters. Judge Mansfield denied their motion to enjoin the general election for the Congressional seat. Following the general election and a further hearing before Judge Mansfield, the court also denied the plaintiffs' further requests for preliminary injunctions setting aside the primary election and forbidding Rangel's certification as the newly elected Representative of the 18th District.

### II.

In the plaintiffs' view, two federal statutes comprehensively protect their ballots against dilution by illegal voting, whether or not the dilution was wilful or knowing. It is appropriate to note at the outset that the plaintiffs do not claim any discrimination because of race. Thus, they face a considerable burden of persuasion in asserting so sweeping and novel a conception, one apparently never before asserted, so far as reported cases reveal. Were we to embrace plaintiffs' theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law. Absent a clear and unambiguous mandate from Congress,[3] we are not inclined to undertake such a wholesale expansion of our jurisdiction into an area which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts.

The plaintiffs would have us find such a mandate, first, in Section 11(a) of the Voting Rights Act of 1965, 42 U.S.C. § 1973i(a):

> No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of this Act or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

This section is an enforcement provision of the Act's comprehensive scheme to eliminate racial discrimination in the conduct of public elections.[4] The phrase "entitled to vote under any provision of this Act" refers back to the statutory

---

2. The parties have stipulated that 1,232 unqualified voters cast their ballots and that Rangel's margin of victory was 150. The claim that defendants' error was decisive to the result rests upon the fact that one-half of the unqualified voters were registered Republicans, whose party had nominated Rangel as its own candidate.

3. In view of our disposition of this case upon grounds of statutory interpretation, we do not reach the question whether Congress could constitutionally authorize federal judicial review to ensure the error-free operation of the election machinery in elections for both state and federal office, or for federal office alone. Cf. Oregon v. Mitchell, 400 U.S. ——, 91 S.Ct. 260, 27 L.Ed.2d —— (Dec. 21, 1970).

4. In addition, the Act abolished the poll tax, 42 U.S.C. § 1973h, and outlawed an

proceedings whereby a state's voting qualification standards may be set aside and federal examiners appointed to maintain a list of eligible voters where an unusually low percentage (as defined in the Act), of qualified citizens are registered. 42 U.S.C. §§ 1973–1973g.

Much can be said for the view that this section on its face provides the plaintiffs no relief because they do not allege that the New York election officials "*willfully*" failed to tabulate their votes without dilution by non-Democrats' ballots. A colorable claim can be made, however, that the election officials failed "to permit [the plaintiffs] to vote," a phrase not modified by "willfully," because the Act defines "voting" to encompass "all action necessary to make a vote effective * * * including * * * having such ballot * * * included in the *appropriate* totals of votes cast * * *." Act § 14(c) (1), 42 U.S.C. § 1973*l*(c) (1) (emphasis added). Plaintiffs attempt to yoke this latter language to the events which gave rise to their complaint by construing their votes as having been included in "inappropriate" totals, since the tabulation of their ballots included those of unqualified non-Democrats. Because we hold that plaintiffs' case suffers from a more fundamental weakness, however, we need not decide whether "appropriateness" is to be determined with reference to such standards as this argument suggests.

■ Since plaintiffs do not claim to be "entitled" to vote by operation of the

Voting Rights Act, their case rests entirely upon the six words "or is otherwise qualified to vote." They would isolate these words from their context in the Act and set them before us as a general mandate by which Federal courts may correct election deficiencies of any sort. We decline to perform any such radical and selective surgery. We do not believe that by appending the quoted language Congress intended to free them of the goal which permeates the entire Act—the abolition of racial discrimination in the election process. Learned Hand instructed us that "Words are not pebbles in alien juxtaposition." NLRB v. Federbush Co. Inc., 121 F.2d 954, 957 (2d Cir. 1941). Since the plaintiffs expressly disavow the claim that they are the victims of any racial, or indeed any other purposeful and wrongful discrimination, the Act provides no remedy.

An examination of the Act's legislative history, moreover, reveals nothing to support the wide ranging role which the plaintiffs assign to the phrase "or is otherwise qualified to vote." The Senate version of section 11(a), otherwise quite similar to the House version,[5] omitted these words, and the House did not attribute any special significance to the presence of the phrase in its version.[6] Although we are not required to construe the phrase beyond holding that it does not reach the plaintiffs' case, it might well have been added as a precaution against an interpretation of the Act as the exclusive statutory guarantee of a federal right to vote.

---

English literacy requirement as to would-be voters who have completed a sixth-grade education in any American-flag school. 42 U.S.C. § 1973b(e).

5. Section 11(a) of S. 1564 provided: No person acting under color of law shall fail or refuse to permit to vote any person who is entitled to vote under any provision of this Act, or fail or refuse to count such person's vote. The corresponding language of the House bill became the language of the Act.

6. Like the Senate Report, S.Rep.No.162, 89th Cong., 1st Sess., pt. 3, at 17 (1965), the House Report found constitutional

authority for its legislation in the 15th Amendment, which applies only to racial discrimination in voting. H.R.Rep.No. 439, 89th Cong., 1st Sess. 16–17 (1965). The House Judiciary Committee's explanation of section 11(a) merely repeated the language of the bill. *Id.* at 30. In 193 pages of House debate, no mention was made of section 11(a), other than that "civil and criminal remedies are provided for the enforcement of the act." 111 Cong.Rec. 15987–88, 16028 (1965). In the conference report, the choice of the House version was noted without comment. H.R.Rep.No.711, 89th Cong., 1st Sess. 13 (1965).

### III.

The plaintiffs invoke the first section of the Civil Rights Act of 1871, 42 U.S. C. § 1983, as a second Congressional authorization for the federal courts to remedy errors in the election process. This concededly broadly-drafted statute provides a remedy against "[e]very person who, under color of any statute * * * subjects * * * any citizen of the United States * * * to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Three constitutional guarantees are claimed to have been abridged here: the equal protection and due process clauses of the fourteenth amendment, and the requirement of article I, section 2, that Representatives be "chosen * * * by the People."

These claims do not require extended consideration. Uneven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only if it represents "intentional or purposeful discrimination." Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). See Swain v. Alabama, 380 U.S. 202, 204–205, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Oyler v. Boles, 368 U.S. 448, 82 S.Ct. 501, 7 L. Ed.2d 446 (1962).[7] Similarly, the due process clause and article I, section 2 offer no guarantee against errors in the administration of an election. New York Election Law §§ 145, 330(2) provide a method for correcting such errors as are made, and the plaintiffs do not contest the fairness and adequacy of that remedy. And while article 1, section 2 may outlaw purposeful tampering by state officials with the conduct of a primary election for a Congressional seat, United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941), we cannot believe that the framers of our Constitution were so hypersensitive to ordinary human frailties as to lay down an unrealistic requirement that elections be free of any error.

Affirmed.

---

7. In the area of racial discrimination this may be viewed from a different perspective. See, e. g., Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968); Kennedy Park Homes Ass'n, Inc. v. City of Lackawanna, 436 F.2d 108 (2d Cir. 1970).