**Melvin LADNER and Timothy Carl, Plaintiffs,**

v.

**The CITY OF NEW YORK, the Board of Elections of the City of New York, the Police Department of the City of New York, the Board of Education of the City of New York, Barbara M. Kett, as Chief Clerk of Staten Island Board of Elections, the Staten Island Board of Elections, and the Richmond County Board of Elections Defendants/ Third–Party Plaintiffs,**

v.

**PROPORTIONAL COUNTS ASSOCIATES, INC., Third–Party Defendant.**

No. 94 CV 2863(NG).

United States District Court, E.D. New York.

Sept. 14, 1998.

Jeffrey M. Motelson, Moskowitz, Passman & Edelman, New York, NY, for Plaintiffs.

Alessandra F. Zorgniotti, Asst. Corp. Counsel, City of New York Law Dept., New York, NY, for Defendants.

**OPINION AND ORDER**

GERSHON, District Judge.

Plaintiffs Melvin Ladner and Timothy Carl, two unsuccessful candidates in the May 4, 1993 election for Community School Board, District 31 ("Community School Board 31") in Staten Island, New York, bring this action pursuant to 42 U.S.C. §§ 1983 and 1985(3) alleging violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Defendants City of New York, Board of Elections of the City of New York ("Board of Elections"), the New York City Police Department[1], the Board of Education of the City of New York, Barbara Kett, Chief Clerk of the Staten Island Borough Office of the Board of Elections, the Staten Island Board of Elections and the Richmond County Board of Elections[2] move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the amended complaint. Plaintiffs also move for summary judgment, on the ground that defendants destroyed ballot stubs and stub boxes, which, they claim, were vital to their proof. The third-party defendant, Proportional Counts Associates, Inc., an independent company hired to do the actual counting of ballots for the election, has answered.

**FACTS**

Unless otherwise indicated, the following facts are undisputed.

On May 4, 1993, the Board of Elections of the City of New York conducted a city-wide election in which nine members were elected to each Community School Board. Plaintiffs were two of the 25 candidates for the nine seats on the Community School Board 31, which comprised all of Staten Island. Plaintiffs, who describe themselves as adhering to a conservative political philosophy, campaigned for election on a platform opposing the "Children of the Rainbow" curriculum as promoted by then-New York City Chancellor of Schools Joseph Fernandez and then-New York City Mayor David Dinkins.

Staten Island was divided by the Board of Elections into three Assembly Districts ("ADs"), the 59th, 60th, and 61st. Within each AD, there were numerous Election Dis-

---

1. The New York Police Department is not a suable entity, but rather an organizational subdivision of the City of New York lacking independent legal existence. *See, e.g., East Coast Novelty Company, Inc. v. City of New York*, 781 F.Supp. 999, 1010 (S.D.N.Y.1992).

2. The Staten Island Board of Elections and the Richmond County Board of Elections do not exist as separate entities. The Board of Elections has a Staten Island Borough Office. Defendant Barbara Kett is the Chief Clerk of that office.

tricts ("EDs") and the resulting entities were called "ED/ADs." For example, the 41st ED within the 60th AD was called the "41/60 ED/AD." Some ED/ADs were divided into sub-EDs or assigned an "H" designation; these were areas consisting of individual apartment buildings, developments or nursing homes which had enough registered voters to make up an independent sub-ED within the main ED territory. As a result, some ED/ADs had more than one ballot box. Although all of Staten Island was divided into separate ED/ADs, a single site, such as a school, frequently served as the polling site for several different ED/ADs.

By statute, the Board of Elections is authorized to combine certain ED/ADs with one another if there are not enough registered voters to maintain an independent ED/AD. N.Y. Elec. L. § 4–104(5)(a). For the 1993 school board election, the Board of Elections combined the 37th ED/60th AD ("37/60") into the 95th ED/60th AD ("95/60") and the 101st ED/60th AD ("101/60") into the 90th ED/60th AD ("90/60"). As a result, the 95/60 ballot box was used to collect ballots from 37/60 and 95/60, and the 90/60 ballot box was used to collect ballots from 101/60 and 90/60.

In accordance with New York Education Law § 2590–c(7), the 1993 school board election was conducted using a proportional representation voting procedure. *See generally Campbell v. Board of Education*, 310 F.Supp. 94, 98–102 (E.D.N.Y.1970). At the polls, each registered voter was given a paper ballot which included the names of the 25 candidates for election to Community School Board 31. Each ballot designated the particular ED/AD where it was to be voted; the ballots themselves, however, were not individually numbered. The order of the names of the candidates on the ballots was rotated by ED/AD so that each candidate's name had an equal opportunity to appear on top, middle or bottom of the ballots. Voters were instructed to vote by preference. That is, they were directed to mark, using a pen or pencil, a "1" by their first choice candidate, a "2" by their second choice candidate, and so forth. Voters could mark as many choices as they pleased. Voters were directed to fold the completed ballot and give it to the election inspectors, who would place it in the ballot box.

Attached to all ballots were ballot stubs, which were numbered from 1 to 500. The ballot stubs were used primarily to enable election officials to know how many ballots had been distributed. After marking their preferences on the ballot, voters were instructed to place the ballot stub in the stub box.

Sample ballots were provided upon request to voters while they waited to vote. Sample ballots were identical to the official ballots except that they were printed in a different color and the stubs were printed without numbers. The sample ballots were buff colored and the official ballots were white. During the election, Barbara Kett, who was responsible for the administration of the 1993 election for Community School Board 31, was informed that many voters had mistakenly cast sample ballots, instead of official ballots, in the ballot boxes. The Board of Elections later determined that the sample ballots should be counted because they were cast by registered voters.

During the election, Kett was also notified by election inspectors at four polling sites, which housed the ballot boxes for more than one ED/AD, that they had ballots which did not reflect the proper ED/AD. Kett went with two clerks, Jill Jackson and Marion Kaminski, to each of these sites and confirmed that the police had mistakenly delivered ballots to the wrong ED/AD voting tables within that polling site. Kett and the two clerks temporarily suspended voting and moved the unused ballots to their correct ED/AD tables. After opening the ballot boxes to verify that ballots had been cast in the wrong ED/AD ballot boxes, they corrected, in ink, the ED/AD designation on each ballot to reflect the proper ED/AD. They then marked each correction with their initials, "BMK," "JJ," and "MK," respectively. Kett explains that she did not see how the votes were cast and made no changes to the voting sections of the ballots. The ballots were returned to their ballot boxes, and voting recommenced.

When the polls closed at 9:00 p.m. on May 4, 1993, the ballot boxes and stub boxes at each polling site were sealed. Election inspectors filled out ballot box certificates, which accounted for the total number of ballots cast at each ED/AD. There was a total of approximately 24,000 votes cast in this election for Community School Board 31. The ballot boxes were moved from the polling places to police precinct houses and eventually to the central counting site. Each time the ballot boxes were moved, election officials used "tick-off" sheets, listing all the ballot boxes, for accounting purposes. The count was conducted at the Egbert Intermediary School in Staten Island from May 13, 1993 to May 18, 1993.

Under the system of proportional representation set forth in Section 2590–c of New York Education Law, ballots are counted by ED/AD in an order determined by lot. As an initial matter, all of the first choices marked on the ballots are counted. This system was described in *Campbell*, as follows:

> After all of the first preferences are counted, and the total number of valid ballots cast in the school district becomes known, a formula is applied to determine whether any candidates have been elected. To win, a candidate's votes must surpass a quota determined by dividing the total number of valid ballots cast in the school district by one more than the number of offices to be filled (in this case, the number is 10, since 9 board members are to be elected in each school district), and then adding one to this total. If any candidate reaches this quota figure, all ballots cast for him in excess of that number are to be awarded to the second choice marked on them.... A similar procedure is utilized to remove candidates. First, after the transfer of surplus votes described above, all first preference votes credited to candidates receiving the fewest votes are to be transferred to the second choices indicated on the ballots. Upon completion of this transfer, the candidate remaining who has the lower number of votes is declared defeated, and his second preference votes are transferred to the remaining undefeated candidates. Once transfers are sufficient to enable a candidate to pass the quota, he is declared elected, and all subsequent preferences attributed to him are transferred to the candidate with the next highest preference. This process is continued until all but the desired number of elected officials have been eliminated.

*Campbell*, 310 F.Supp. at 99.

Neither Kett nor any personnel from the Board of Elections participated in the counting of the ballots. The task was contracted out to an independent company, Proportional Counts Associates, Inc., the third-party defendant in this case. The Staten Island Count Director was Bruce Hogenauer, an employee of Proportional Counts Associates, Inc.

Plaintiffs attended the count and observed several election irregularities, which form the bases for their complaint in this action. Objecting to these election irregularities, Ladner filed a protest sheet. Defendants deny that any such protest sheet was ever submitted. For purposes of this motion, Ladner's allegation regarding the filing of the protest sheet is accepted as true.

Plaintiffs observed that, during the random draw which determines the box order for counting purposes, the boxes for 37/60 and 101/60 were not located when those boxes were announced. Plaintiffs notified Count Director Hogenauer and demanded that the count be stopped until the boxes were located. Hogenauer refused, and the election count proceeded. It is unrefuted that, since the Board of Elections had previously combined several ED/ADs, including 37/60 and 101/60, with other ED/ADs, the allegedly missing ballot boxes never in fact existed.

Plaintiffs observed "hundreds or thousands" of ballots being counted, with writing in ink on them, bearing the initials "BMK," "JJ," or "MK." Carl Dec. ¶ 15; Ladner Dec. ¶ 20. Plaintiffs showed Hogenauer these altered ballots, marked some of these ballots with a red "P" for protest, and demanded the count be stopped. Hogenauer counted them over their protest. Defendants' explanation for the initials on certain ballots is set forth above.

Plaintiffs observed numerous sample ballots, instead of official ballots, being counted. As noted above, defendants acknowledge that, in this election, some sample ballots were cast and counted, and that the Board of Elections advised Hogenauer to count the sample ballots because they had been cast by registered voters.

Plaintiffs observed "hundreds, if not thousands of ballots which appeared to be voted in identical handwriting, with scores of identical patterns." Carl Dec. ¶ 15; Ladner Dec. ¶ 20. Plaintiffs believe that these "identical" ballots were "stuffed" into the ballot boxes. Defendants deny that any ballots were altered. Hogenauer investigated this allegation during the count and determined that the handwriting was not similar and therefore included the challenged ballots in the count.

Plaintiffs observed "hundreds (if not thousands) of ballots" where the "1" and "2" votes for them had been altered to "11" and "12", with new candidates chosen as "1" and "2." Carl Dec. ¶ 15; Ladner Dec. ¶ 52. Defendants again deny that any ballots were altered.

Plaintiffs noticed that there were more than one ballot box from a single AD/ED at the count site. Defendants acknowledge that, since some ED/ADs were divided into sub-EDs or given an "H" designation, there were multiple ballot boxes for certain ED/ADs.

Plaintiffs observed ballot boxes which, plaintiffs believed, had been opened and later resealed with tape. They noticed that the re-taping had peeled away portions of the paper boxes. Defendants acknowledge that, since the ballot boxes were moved several times, they required some re-taping.

Plaintiffs saw ballot boxes being counted without including the absentee ballots from that ED/AD. Hogenauer explained that the absentee ballots were treated separately and, therefore, the absentee ballots from all the ED/ADs would be counted together at the end of the count.

Plaintiffs also saw that ballots which were in the wrong ED/AD boxes had been counted. Defendants acknowledge that, if ballots from the wrong ED/AD were counted, it was done pursuant to New York Election Law § 9–108(4) which requires the counting of misplaced ballots.

After the count, the election materials were removed from the Egbert Intermediate School. There were nine sealed boxes, one for each winning candidate, containing the ballots which elected each candidate. A tenth box contained the spoiled or void ballots and an eleventh box contained the exhausted ballots. (Exhausted ballots were those ballots which could not be transferred to other candidates during the count because all the candidates identified by the voter had already received the requisite number of votes to be elected.) These eleven boxes, which contained all the ballots, were locked in a secure room at the Staten Island Borough Office, where they have been continuously maintained. The remaining over 300 empty ballot boxes, the stub boxes, and the approximately 24,000 ballot stubs were discarded.

When the count was completed on May 18, 1993, plaintiffs were not among the nine winning candidates. The final results of the 1993 city-wide school board election were certified by the Board of Elections on June 1, 1993. Plaintiffs filed a notice of claim with the New York City Comptroller on September 27, 1993, alleging election fraud. Thereafter, plaintiffs commenced this action in New York State Supreme Court and, since plaintiffs alleged only violations of federal law, defendants removed the action to this court on the basis of federal question jurisdiction. On February 9, 1995, the Honorable I. Leo Glasser, District Judge, denied defendants' motion to dismiss plaintiffs' Section 1983 claims, but granted the motion to dismiss the conspiracy claim under Section 1985(3) with leave to replead. *Ladner v. City of New York,* 1995 WL 62687 (E.D.N.Y. Feb. 9, 1995). On March 14, 1995, plaintiffs filed an amended complaint.

Pursuant to a July 1996 Order of the Honorable Joan Azrack, Magistrate Judge, plaintiffs inspected the original ballots at the Staten Island Borough Office of the Board of Elections. Based on their observations at the inspection, plaintiffs now allege additional election irregularities, specifically, that the

approximately 24,000 ballot stubs and Ladner's protest sheet had been destroyed, and that there had been a significant "diminution" in the number of sample ballots and fraudulent ballots.

Finally, based on an anonymous tip after the election, plaintiff Ladner hired a private investigator, who claimed to find that 4 people "arose from the dead, to register and to cast their ballots for the school board candidates of their choice" during the 1993 election. Ladner Dec. ¶ 37.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It is the movant's burden to demonstrate the absence of any genuine issue of material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 175, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). A material fact is one whose resolution would "affect the outcome of the suit under governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### Section 1983 Claims

In order to maintain an action under 42 U.S.C. § 1983, plaintiffs must demonstrate conduct committed by a person acting under color of law that deprived them of rights, privileges, or immunities secured by the Constitution or the laws of the United States. Here, plaintiffs allege that their rights to due process and equal protection of the laws as guaranteed by the Fourteenth Amendment were violated by defendants' "fraudulent election acts, in causing, permitting and/or allowing wide spread fraud in the casting, tabulation and entering of ballots and results in the Staten Island School Board Elections." Amended Complaint ¶ 16.

■ "It has been said often and with great force that there is no right more fundamental in our country than the right to vote." *Gelb v. Board of Elections in the City of New York,* 950 F.Supp. 82, 84 (S.D.N.Y.1996) (citing *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)). Where there is an adequate state law remedy, however, mere election irregularities rarely rise to the level of a federal constitutional violation. In *Powell v. Power,* 436 F.2d 84 (2d Cir.1970), voters sought relief pursuant to Section 1983, alleging that state officials had abridged their rights to due process and equal protection by allowing unqualified voters to cast ballots in a primary election. In declining to find a federal violation, the Court of Appeals for the Second Circuit explained:

> Were we to embrace the plaintiffs' theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law. Absent a clear and unambiguous mandate from Congress, we are not inclined to undertake such a wholesale expansion of our jurisdiction into an area which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts.

*Id.* 436 F.2d at 86. The Court recognized that a Section 1983 action to remedy errors in the election process allegedly violating the Equal Protection Clause does not lie unless the state action constituted "intentional or purposeful discrimination." *Id.* 436 F.2d at 88. The Court also held that the Due Pro-

cess Clause "offer[s] no guarantee against errors in the administration of an election," noting instead that "New York Election Law §§ 145, 330(2) provide a method for correcting such errors as are made...." *Id.* The Court concluded by stating that it could not "believe that the framers of our Constitution were so hypersensitive to ordinary human frailties as to lay down an unrealistic requirement that elections be free of any error." *Id.*

The Second Circuit recently "reaffirm[ed] ... [its] holding in *Powell.*" *Gold v. Feinberg,* 101 F.3d 796, 802 (2d Cir.1996). In *Gold,* a judicial decree, issued the day before the primary election, which removed one candidate from the ballot, resulted in delays in the arrival of voting machines at approximately one-third of the election districts; votes being miscounted because of the improper placement of templates over ballots; and ineligible candidates remaining on the ballot. The district court concluded that these election irregularities constituted a due process violation under Section 1983 and issued a preliminary injunction prohibiting election officials from certifying the election. The Second Circuit, however, reversed the district court, finding that there was no evidence of "intentional deprivation of the right to vote." *Id.* 101 F.3d at 798. Specifically, it held that "there are no substantiated allegations of any wrongful intent on the part of state officials. All of the irregularities alleged to have occurred were the direct result of a late-issued judicial order." *Id.* 101 F.3d at 801. It therefore rejected the district court's conclusion that certain longstanding practices of the Elections Board regarding the delegation of undue amounts of oversight responsibility to subordinates, which the district court had characterized as "foolish decisions," "constitute[d] willfulness within the meaning" of Section 1983. *Id.* The Court also rejected the district court's suggestion that the "requirement of willfulness established by *Powell* should no longer be required because of 'the passage of 25 years in the Second Circuit and a change of attitude.'" *Id.* The Court then reaffirmed that where

> there exists a state law remedy to the election irregularities that is fair and ade-

quate, human error in the conduct of elections does not rise to the level of a Fourteenth Amendment constitutional violation actionable under § 1983 in the absence of willful action by state officials intended to deprive individuals of their constitutional right to vote. Short of that, human error is something we all have to live with.

*Id.* 101 F.3d at 802.

**Due Process Violations**

■ The election irregularities alleged by the plaintiffs in the present case do not rise to the level of a federal constitutional violation. Several of plaintiffs' allegations of election irregularities are unsubstantiated by any evidence in the record. As to those claims where there exists an issue as to whether an election irregularity occurred, there is no factual issue as to any wrongful intent by election officials to deprive individuals of their constitutional right to vote. Nor can it be said that any of the irregularities rendered the election so pervasively unfair as to require a federal remedy under the Due Process Clause. Therefore, plaintiffs' due process claims must be dismissed.

*Missing Boxes*

Plaintiffs allege that the ballots were counted even though the ballot boxes for 37/60 and 101/60 were missing. Plaintiffs' allegation of missing boxes, however, is unfounded because, since the Board of Elections combined 37/60 into 95/60 and 101/60 into 90/60 before the election, the allegedly missing ballot boxes never existed. The ballot box certificate for 90/60 recorded that there were 68 ballots from 90/60 and 2 ballots from 101/60 in that ballot box, and the ballot box certificate for 95/60 recorded that there were 79 ballots combined from 37/60 and 95/60.

Plaintiff Ladner contends that the ED/ADs in question could not have been combined; he claims that he "obtained proof that in fact 419 voters were reported at 101/60 alone on the 5–4–93 date of election, before 8:00 a.m." Ladner Dec. ¶ 24. The local newspaper article, upon which plaintiff relies, indicated that, by 8:00 *p.m.* (not *a.m.*), there had been 419

votes cast at P.S. 60. While P.S. 60 was listed as the polling site for 101/60 ED/AD, it was also the polling site for at least three other ED/ADs, 88/60, 89/60 and 90/60. Therefore, that 419 voters had cast ballots does not constitute evidence that there was a separate ballot box for 101/60.

Plaintiffs also contend that 37/60 and 101/60 could not have been combined with other ED/ADs because they were included in the list of ED/ADs for the random draw and on one of the "tick-off" lists used by election officials to account for the ballot boxes during moving. This inclusion alone does not establish any willful intent on behalf of state officials. At most, it can be said that some election officials were negligent in mistakenly including these ballot boxes on certain lists when, in fact, they did not exist.

*Altered Ballots with Initials "BMK," "JJ," and "MK"*

There is no dispute that defendant Barbara Kett and two clerks opened ballot boxes, corrected the ED/AD designations on numerous ballots, and added their initials to the corrections. However, there is no evidence that any alterations were made to the votes cast on the initialed ballots or that the corrections had any effect on the outcome of the election. It is undisputed that Kett and her clerks opened ballot boxes and changed the ED/AD designations for the purpose of ensuring that ballots would be counted in their correct ED/AD. Whether or not opening ballot boxes and making alterations to a cast ballot violated state election law, as plaintiffs suggest, no federal constitutional violation has been shown.

*Sample Ballots*

Plaintiffs have established that numerous sample ballots were cast and counted.

Again, there is no evidence to suggest that the outcome of the election was affected by the use of sample ballots in lieu of official ballots. In fact, the Board of Elections decided to count the sample ballots so as not to disenfranchise registered voters who mistakenly cast such ballots. This decision was not a violation of plaintiffs' rights under the Constitution.

*"Stuffed" Ballots with Identical Handwriting and Identical Sequence of Votes*

Plaintiffs allege that ballot boxes were "stuffed" with numerous ballots. Plaintiffs have two bases for this claim: an identical sequence of votes on as many as ten ballots as well as other pairs of ballots with an identical sequence of votes; and the alleged identity of the handwriting on ballots with an identical sequence of votes. To support their claim, plaintiffs now submit photocopies of approximately seventy-five ballots.[3]

That votes were cast for an identical sequence of candidates does not in itself create an issue of fact that there was an election irregularity, much less a constitutional violation. Indeed, identical sequencing of votes on various ballots is not surprising, because it is undisputed that, in this election—where nine candidates were to be selected from a pool of 25—some candidates campaigned together as a coalition and handed out "palm cards" listing candidates in sequential order to voters. Even apart from that, from a total of approximately 24,000 ballots cast in this election for Community School Board 31, it cannot be considered suspicious that ten ballots, or even more, would be cast for the same sequence of candidates.

More importantly, plaintiffs have not established an issue of fact as to whether a single hand wrote more than one ballot. Plaintiffs have not proffered a handwriting

---

**3.** In opposition to defendants' motion for summary judgment, plaintiffs submitted photocopies, made during the July 1996 ballot inspection, of several hundred ballots. Plaintiffs, however, failed to indicate which of the ballots demonstrated their various allegations. Therefore, on oral argument, the court invited plaintiffs to resubmit the ballots and indicate which ballots supported their various allegations of election fraud. In their supplemental submission, plaintiffs included a smaller number of ballots than contained in the original submission and detailed how, they believed, these ballots were fraudulent. In their supplemental reply, defendants submitted the original ballots which correspond to plaintiffs' photocopies of ballots and disputed that the ballots had been altered. The original ballots will be filed with the court in a sealed envelope until the requisite time period for an appeal has passed, or until all appellate proceedings have been completed. At that point, defendants may move the court for the return of the original ballots.

expert, but merely express their own lay opinions that the ballots are identical. Plaintiffs' photocopied ballots and the original ballots, to which they correspond, have been carefully reviewed by the court. Comparison of the ballots fails to reveal anything whatever in support of plaintiffs' claim. Review of the *photocopies* of the ballots reveals no similarity, much less identity, in the handwriting alleged to be the same. Review of the *original* ballots not only confirms this assessment but establishes beyond a doubt that any claim of identity is based in plaintiffs' imagination and not on the evidence.

"When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Services, Limited Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994). Since the evidence supporting plaintiffs' claim of identical, stuffed ballots is so slight, no rational jury could find in their favor on this claim.

*Ballots Altered From "1" and "2" Votes for Plaintiffs to "11", "12" and Other Votes*

Plaintiffs also claim that numerous ballots were altered. Specifically, they claim that "1" and "2" votes for plaintiffs were changed to "11", "12" or other votes for them. Again, plaintiffs do not offer any handwriting expert to support their claims, but instead rely on their own unsupported opinions. Plaintiffs submit photocopies of approximately sixty-five ballots in support of this claim.

Basically, plaintiffs claim that every vote that contains a downstroke, such as a "4", "7", "14" or "17", which was cast for one of them, was originally a "1", and every vote, such as a "12" or "22", which contains a "2", was once a "2" vote for them. This argument is frivolous. It is not supported by any evidence, either on the ballots themselves or external to the ballots. The claim appears to be based on wishful thinking, not reason.

Even on the occasional ballot where there are marks indicating that a number may have been changed, there is no evidence to suggest that the change was not made by the voter at the time of the vote. Plaintiffs have offered no evidence, for example, suggesting

that the changes were made with a writing instrument different from that used to cast the original ballot, and examination of the original ballots reveals no sign of fraud. In sum, plaintiffs have adduced no issue of fact as to whether the ballots were marked by anyone other than the voter during the act of choosing the preferential order of the candidates.

*Duplicate Ballot Boxes From a Single ED/AD*

Plaintiffs' claim that they observed more than one ballot box from a single ED/AD is not an election irregularity at all. Several ED/ADs were divided into sub-ED/ADs or "H" designations, requiring separate ballot boxes; in those instances, there was more than one ballot box from a single ED/AD at the count site.

*Ballot Boxes Which Required Re-taping*

Defendants acknowledge that, since the boxes were moved several times before the ballots were counted, the boxes needed to be re-taped. Contrary to plaintiffs' suggestion, there is no evidence that the boxes were opened for any unlawful purpose.

*Ballot Boxes Counted Without Absentee Ballots*

Hogenauer informed plaintiffs that the absentee ballots would be counted, not with their assigned ED/AD, but altogether, after all the ballots cast at the polling sites had been counted. Whether or not counting the absentee ballots separately from the rest of the ballots amounts to a state election law violation, as plaintiffs suggest, it does not amount to a constitutional violation.

*Ballots Which Were Counted From Incorrect ED/AD Ballot Boxes*

Contrary to plaintiffs' assertions, that some ballots were counted despite being located in the wrong ED/AD ballot box was not only permissible, it was required by New York Election Law § 9–108(4).

*Destruction of 24,000 Ballot Stubs and Stub Boxes*

Plaintiffs claim that the destruction of all 24,000 ballot stubs and the stub boxes constitutes a willful act of election fraud. Plain-

tiffs, however, have failed to explain how the availability of the ballot stubs would be necessary or even helpful to verify the alleged inaccuracy of the election results. Since the official ballots are not numbered at all, there is no correlation between the official ballots and the numbering of the ballot stubs, which run from 1 to 500 in each ED/AD. Therefore, the ballot stubs would be useless to determine if a particular ballot was fraudulently cast. Kett explained that the ballot stubs are used primarily for knowing how many ballots have been distributed and are of limited value to calculating how many votes were actually cast. She explained that the number of stubs in the stubs box do not always match the number of ballots in the ballot boxes because, for example, voters often fail to place the stub in the stub box or, if a voter spoils a ballot, the stub for that ballot is still placed in the stub box, and the voter is given a new ballot, with another stub attached. Moreover, unlike ballots and voting records, New York Election Law § 3–222 does not require the retention of ballot stubs and stub boxes. Finally, since the ballot stubs and other election materials were removed immediately after the election as a matter of course before this action was filed or noticed, there is no indication that any public officials discarded the ballot stubs with any wrongful intent.

### Diminution of "Altered" or Sample Ballots and Destruction of Protest Sheets

Plaintiffs have provided no evidence beyond their own conclusory statements that there has been a "significant diminution" of these ballots to support their claim that there were fewer sample ballots, altered ballots and protest sheets at the July 1996 ballot inspection than they observed during the original count. Plaintiffs make no effort to quantify how many ballots no longer exist; nor do they offer any basis for their opinions. Given the undisputed evidence regarding the manner in which the ballots have been secured since the election count, plaintiffs' references to a "diminution" at the ballot inspection are insufficient to create an issue of fact.

### Dead Voters

Plaintiffs' allegation that four dead people, Thomas Reilly, Pasquale Delio, Theresa Bellia and Ronald Ross, voted in the 1993 school board election lacks support and fails to implicate any wrongful intent on behalf of state officials. Plaintiffs rely upon newspaper obituaries, Voting Activity Lists and Voter Registration Lists to contend that these four individuals fraudulently voted in this election. Examination of these documents, however, does not reveal the voting histories for these individuals. In contrast, Voting History Lists (which are public documents used by the Board of Elections to record personal information for each voter) collect the voting history information, including the date and type of election voted in, which ED/AD voted in, and which type of ballot was used. The Voting History Lists for the four individuals indicate that none of them voted in the 1993 school board election in question. Therefore, plaintiffs' claim of dead voters in this election lacks any basis.

\* \* \*

Finally, it should be noted that the New York courts have jurisdiction to provide a remedy under New York law for the election irregularities as to which there may be a fact issue. *See* N.Y. Elec. L. §§ 16–100 *et seq.* Judicial proceedings challenging Community School Board elections are subject to the New York election laws. *See* N.Y. Educ. L. § 2590–c(6). Plaintiffs make no showing that New York courts cannot provide a fair and adequate remedy other than to argue that the irregularities are so serious as to require federal court intervention. As shown above, plaintiffs have been unable to establish an issue of fact as to their claims of serious irregularities.

### Equal Protection Violations

■ Plaintiffs have also failed to demonstrate that defendants engaged in any intentional effort to discriminate against plaintiffs on the basis of their conservative political philosophy. *See Powell v. Power*, 436 F.2d at 88. In the amended complaint, plaintiffs allege that former Mayor David Dinkins, a Democrat, and defendants worked together to prevent plaintiffs from being elected to Community School Board 31 because plain-

tiffs campaigned on a politically conservative platform. Plaintiffs do not offer any evidence beyond a newspaper article setting forth Mayor Dinkins' involvement in a City-financed voter drive for the school board election at issue and the fact that Barbara Kett· was a member of the Executive Committee of the Richmond County Democratic Party Organization, to suggest that they were intentionally discriminated against because they are conservative politicians. The newspaper article, even were it not inadmissible hearsay and unusable to defeat summary judgment, see FED. R. CIV. P. 56(e), merely states that Mayor Dinkins committed $635,000 to mail cards to all of the City's registered voters. Although the campaign was non-partisan in nature, an unnamed mayoral aide was reported to state the belief that, if more New Yorkers voted, they would reject "conservative candidates and support [Mayor Dinkins's] educational policies." These comments do not establish that any constitutional violation occurred during the election. Since plaintiffs have failed to demonstrate intentional discrimination, their Section 1983 claims for violations of the Equal Protection Clause must be dismissed.

### Conspiracy under Section 1985(3)

■ Plaintiffs have also failed to demonstrate any evidence of a conspiracy among the defendants to violate their rights to equal protection of the laws. In the amended complaint, plaintiffs alleged that Mayor Dinkins conspired with defendants in violation of 42 U.S.C. § 1985(3) to prevent their election. To prevail on a Section 1985(3) claim, plaintiffs must prove that defendants (1) engaged in a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person of the equal protection of the laws; (3) acted in furtherance of the conspiracy; and (4) deprived such person of the exercise of any right or privilege of a citizen of the United States. *New York State N.O.W. v. Terry*, 886 F.2d 1339, 1358 (2d Cir.1989). Here, there is no evidence of a conspiracy. Plaintiffs again merely point to the involvement of Mayor Dinkins, a Democrat, in a City-financed voter drive and the fact that Barbara Kett is a member of the Executive Committee of the Richmond County Demo-

cratic Party to suggest there was a conspiracy against plaintiffs, who were politically conservative. Summary judgment therefore should be granted dismissing plaintiffs' conspiracy claims.

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

■ Plaintiffs contend that, in failing to preserve the ballot stubs and stub boxes, defendants destroyed "vital, essential evidence," which, they allege, could have been used to verify the ballots cast. They argue that, because defendants participated in the destruction of such evidence, summary judgment must be granted against defendants. In support of this proposition, plaintiffs cite product liability cases in which the plaintiffs or third-party plaintiffs destroyed the product which caused the injury before the defendants had an opportunity to inspect the defective product, making it impossible for defendants to defend the case. *See e.g., Thiele v. Oddy's Auto and Marine, Inc.*, 906 F.Supp. 158 (W.D.N.Y.1995). Such cases are clearly inapplicable here. As previously explained, plaintiffs have failed to demonstrate how the ballot stubs could demonstrate willful election fraud in this case. New York Election Law does not require the retention of ballot stubs. N.Y. Elec. L. § 3–222. Therefore, plaintiffs' motion for summary judgment must be denied.

### CONCLUSION

Defendants' motion for summary judgment is granted. Plaintiffs' motion for summary judgment is denied. The Clerk of Court is directed to· enter judgment dismissing the complaint.

**SO ORDERED.**